IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 20-0863
_____

FILED

**May 20, 2022**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Laura Goddard,
Plaintiff Below, Petitioner,

v.

Tyler Hockman and Emily A. Hockman,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Jefferson County
The Honorable David M. Hammer, Judge
Civil Action No. CC-19-2018-C-14

REVERSED AND REMANDED WITH DIRECTIONS
_____

Submitted: January 11, 2022
Filed: May 20, 2022

Katherine N. Ridgeway, Esq.
Crawford Law Group PLLC
Martinsburg, WV
Counsel for Petitioner

Kathy M. Santa Barbara, Esq.
Law Office of Kathy M. Santa
Barbara, PLLC
Martinsburg, WV
Counsel for Respondents

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting opinion.

JUSTICE BUNN did not participate in the decision of this case.

# SYLLABUS BY THE COURT

1.     "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. Am. Travellers Life Ins. Co.,* 204 W.Va. 430, 513 S.E.2d 657 (1998).

2.     "A 'deed of trust' is a deed that conveys title to real property in trust as security until the grantor repays the loan. In the case of default of a debt secured by a deed of trust, the property becomes liable to sale under the power of sale conferred upon the trustee." Syl. Pt. 7, *Arnold v. Palmer*, 224 W. Va. 495, 686 S.E.2d 725 (2009).

3.     "The rights, powers, and duties of a trustee in a deed of trust executed to secure the payment of a debt are limited and defined by the instrument under which he acts[.]" Syl. Pt. 5, in part, *George v. Zinn*, 57 W. Va. 15, 49 S.E. 904 (1905).

4.     "A bona fide purchaser at a trustee's sale (regularly conducted) under a recorded deed of trust takes the property sold free from a recorded contract relating thereto, made by the grantor of the trust deed, subsequent to the deed but prior to the sale; neither

the trustee nor the beneficiary being a party to the contract." Syl. Pt. 2, *Carden v. Bush*, 109 W. Va. 655, 155 S.E. 914 (1930).

5.      "Where the owner of land divides it into lots in pursuance of a general plan for the development of an exclusively residential area and conveys the several lots to different grantees by deeds containing identical or substantially similar covenants restricting the use of the lots to residential purposes, an action in the nature of a suit in equity may be maintained by an owner of one such lot against the owner or owners of any other lot to compel compliance with the restriction. Syl. Pt. 1, *Wallace v. St. Clair,* 147 W.Va. 377, 127 S.E.2d 742 (1962)." Syl. Pt. 1*, Jubb v. Letterle*, 185 W. Va. 239, 406 S.E.2d 465 (1991) (citation omitted).

6.      "When lands are laid off into lots, streets, and alleys, and a map plat thereof is made, all lots sold and conveyed by reference thereto, without reservation, carry with them, as appurtenant thereto, the right to the use of the easement in such streets and alleys necessary to the enjoyment and value of such lots." Syl. Pt. 2, *Cook v. Totten*, 49 W. Va. 177, 38 S.E. 491 (1901).

**WOOTON, Justice:**

In the proceedings below, plaintiff/petitioner Laura M. Goddard ("the petitioner"), the owner of acreage originally designated as a common area ("the remaining acreage" or "the subject property") for the use of all property owners in the Falcon Ridge subdivision located in Jefferson County, West Virginia, sought a declaratory judgment that the subject property, having been purchased by her predecessors in interest at a trustee's sale following the original owner's default on a loan secured by a deed of trust on the parent tract, is free of any covenants or restrictions that post-dated the execution of the deed of trust. The circuit court denied relief, finding that neither the petitioner nor her predecessors in interest were bona fide, or "innocent," purchasers of the acreage within the meaning of *Carden v. Bush*, 109 W. Va. 655, 155 S.E.2d 914 (1930). *See* text *infra*. Consistent with this ruling, the court denied the petitioner's request for declaratory relief and granted judgment to the defendant/respondents, Tyler and Emily A. Hockman ("the respondents") on their counterclaim, finding that the respondents had an easement in the subject property. The court designated its order as a final judgment pursuant to Rule 54(b) of the West Virginia Rules of Civil Procedure, and this appeal followed.

After careful consideration of the parties' briefs and arguments, the appendix record, and the applicable law, we conclude that the circuit court was clearly wrong in determining that the petitioner's predecessors in interest, Brian and Sylvia Stephens ("Mr. and Mrs. Stephens") were not bona fide purchasers when they acquired the subject property at the trustee's sale. Accordingly, we further conclude that the trustee's sale of the acreage

1

to Mr. and Mrs. Stephens extinguished all prior covenants and restrictions that post-dated the execution of the deed of trust, and that their successor in interest, the petitioner, took the subject property free and clear of all such covenants and restrictions.

## I. Facts and Procedural Background

The petitioner and the respondents both own property in the Falcon Ridge subdivision located in Jefferson County, West Virginia. The subdivision, which consists of eight residential lots as well as approximately 21.78 acres originally intended to be a common area, was built on an 81.6735-acre tract of property ("the parent tract")[1] that was purchased on February 3, 2005, by Wolverine Investments, LLC ("Wolverine").[2] Wolverine financed the purchase of the parent tract with loans from Jefferson Security Bank ("JSB"), which loans were secured by a deed of trust conveying the property to K. Stephen Morris, Trustee,[3] for the benefit of JSB. In the deed of trust the property was

---

[1] The deed from Gary and Janeen D. Watson to Wolverine ("the Watson deed") conveyed a 104-acre parcel of land, less and excepting two parcels consisting of 15.04 and 7.2865 acres, respectively.

[2] The conveyance was made "subject to all those reservations, restrictions, easements and other matters of record and more particularly those covenants recorded in the aforesaid Clerk's Office in Deed book 324, at Page 489." None of the referenced reservations, restrictions, easements and/or other matters are relevant to the issues raised in this case.

[3] In 2012, Richard A. Pill was appointed as substitute trustee. In this opinion, all references to "the trustee" are references to Mr. Pill, since the specific properties at issue herein were purchased at a trustee's sale noticed and conducted by him.

described by the same metes and bounds description as that contained in the Watson deed.

Of particular significance to this case, the deed of trust contained the following language:

> Amendments. This Deed of trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

After securing the loans, Wolverine proceeded with development of the subdivision, filing a Community Impact Statement ("the CIS") with Jefferson County Planning, Zoning and Engineering on or about August 1, 2005; filing a Final Plat of Falcon Ridge Farms ("the Final Plat") with the county clerk on or about December 22, 2006;[4] and filing an Amended and Restated Declaration of Covenants, Conditions and Restrictions for Falcon Ridge Subdivision ("the Declaration") with the county clerk on March 12, 2009. Significantly, the deed of trust was never amended to include any mention of the CIS, the Final Plat, or the Declaration.

Of relevance to the respondents' arguments in this case, the CIS provided, inter alia, that

> [t]he internal roadway network to be constructed by the developer shall serve all of the lots. The proposed Falcon Ridge Drive is a typ. 50' right-of-way that spans 3,141 feet . . . There will also be a 21.78 acre commons [sic] area that will be used

---

[4] Although there were subsequent revisions to the Final Plat, none are relevant to the issues raised in this case.

3

by everyone in the subdivision. It will contain of [sic] grassland
and [be] used for horse grazing and horseback riding[.]

With respect to the referenced "common area," the CIS further stipulated that although

under certain circumstances a dwelling located in the subdivision could be used for what

was described as a no-impact home-based business, "in no event shall the Common Area

be used by or in connection with any permitted no-impact home-based business."

The Final Plat contained "Notes" that provided, inter alia, that

10. A homeowner's [sic] association must be established
without delay as soon as 50% of properties are sold.
Membership in the association is mandatory for all property
owners within the subdivision. All developers shall dedicate all
common lands (swim basin, roads, rights-of-way, etc.) to the
homeowner's [sic] association.

11. A common interest ownership agreement must be
established to provide for the maintenance of commonly-
owned land, including, but not limited to the private access
roads within the subdivision. This common interest ownership
agreement must be developed in accordance with the Uniform
Common Interest Ownership Act of West Virginia.[5]

13. Each parcel shown on this plat shall be restricted to a
single family residence only unless otherwise approved by the
planning commission in conformance with the prevailing
county land development laws.

In similar vein, the Declaration unequivocally evidenced Wolverine's

intention to establish a homeowners' association to govern all aspects of ownership in

---

[5] *See* W. Va. Code §§ 36B-1-101 to -4-120 (2011).

4

Falcon Ridge, including membership and voting rights, maintenance obligations, and restrictions on use, alienation, and occupancy. Of particular relevance here, article I, section 6 of the Declaration provided that

> "Common Area" shall be an inclusive term referring to those areas of land shown on any recorded subdivision plat of the Properties and intended to be devoted to the common use and enjoyment of the Owners of the Properties. The initial Common Area shall be conveyed to the Association prior to the conveyance of a Lot or Residence to any purchaser.

As noted, the Amended and Restated Declaration was filed with the county clerk; however, although Wolverine sold five of the eight lots by 2010[6] – more than the 50% threshold set forth in the Final Plat – no homeowners' association was ever established and there was never any "dedication" of the common area, by conveyance or otherwise, to the lot owners.

Ultimately, Wolverine defaulted on its loans, and a trustee's sale was noticed for December 27, 2012, for lots 2, 3, and 7, plus "any remaining acreage,"[7] the trustee's

---

[6] Wolverine sold lots 1, 4, 5, 6, and 8, the latter of which was purchased by the petitioner on August 15, 2010. Each of the deeds evidencing these transactions ("the Wolverine deeds") referenced the existence of the Final Plat and specifically stated that the conveyance in question was subject to the "Notes" on the Final Plat, as well as the covenants and restrictions contained in the Watson deed. As each of these lots was sold by Wolverine, JSB released the relevant acreage from the deed of trust on the parent tract. *See* text *infra*.

[7] The Trustee's Notice of sale listed the property to be sold as all of the acreage conveyed in the Watson deed, fully described by metes and bounds, "LESS AND EXCEPTING Lots 1, 4, 5, 6, and 8, Falcon Ridge Farms . . . LESS AND EXCEPTING 44 acres as shown on a plat recorded in Deed Book 1011 at page 58 [and] LESS AND EXCEPTING .54874 acres as shown on a merger plat recorded in Deed Book 1097 at pages

5

designation of the common area. At the trustee's sale, JSB purchased the three lots and Mr. and Mrs. Stephens purchased the "remaining acreage," which included an access road. Each of the trustee's deeds described the property conveyed using the language contained in the Watson deed. *See supra* notes 1 & 2. Further, in contrast to the pre-foreclosure deeds from Wolverine to the owners of Lots 1, 4, 5, 6, and 8, the deeds from the trustee to JSB and Mr. and Mrs. Stephens contained no language to the effect that the conveyances were subject to any covenants or restrictions in the CIS, the Final Plat and its "Notes," or the Declaration.

Thereafter, on February 7, 2013, the petitioner purchased Lots 2 and 3 from JSB, and on July 1, 2013, the respondents purchased Lot 7 from JSB. As was the case with the trustee's deeds conveying these lots to JSB, the deeds from JSB to the petitioner and the respondents, respectively, contained no language to the effect that the conveyances were subject to any covenants or restrictions in the CIS, the Final Plat and its "Notes," or the Declaration.

Finally, on February 8, 2017, more than four years after the trustee's sale, the petitioner purchased the "remaining acreage" from Mr. and Mrs. Stephens.[8] The February

593 and 594." It should be noted that no party to this action has ever contested the form, content, or timing of the Notice.

[8] As noted, the petitioner already owned lot 8, which she had purchased from Wolverine on August 15, 2010, and Lots 2 and 3, which she purchased from JSB on February 7, 2013. These lots are not at issue in this case.

8, 2017, deed from Mr. and Mrs. Stephens to the petitioner ("the Stephens deed") described the property conveyed as follows:

> Being all that "Common Area" containing 21.52082 acres, more or less, as the same is designated and described on a plat entitled 'Final Plat of Falcon Ridge Farms," dated December 22, 2006, revised February 21, 2007 and February 26, 2007, made by William H. Gordon Associates, Inc., and recorded in the Office of the Clerk of the County Commission of Jefferson County, West Virginia in Plat Book 24, at Page 1, TOGETHER WITH right to use Falcon Ridge Drive and subject to the rights of others to use Falcon Ridge Common Areas including Falcon Ridge Drive.

However, a corrected deed[9] dated July 24, 2017, eliminated this language and described the property exactly as it had been described in the trustee's deed, i.e., a recitation of the original metes and bounds set forth in the Watson deed, with certain exceptions. *See supra* note 8. The only mention of the Final Plat was as follows: "LESS AND EXCEPTING Lots 1, 2, 3, 4, 5, 6, 7, and 8, Falcon Ridge Farms, as shown on the plat recorded in Plat Book 24, at Page 1."

After purchasing the subject property from Mr. and Mrs. Stephens, the petitioner sent an open letter to her Falcon Ridge neighbors giving notice of her intentions

---

[9] The petitioner represents that the corrected deed was necessary because the original deed failed to convey Mr. and Mrs. Stephens' entire interest, specifically, title to the access easement known as Falcon Ridge Drive, which was part of the "additional acreage" purchased by the Stephenses at the trustee's sale.

with respect to use of what was formerly the common area.[10] The respondents objected and, according to petitioner, threatened to file suit,[11] after which petitioner initiated the underlying lawsuit on January 19, 2018,[12] seeking a declaratory judgment that the subject property is unrestricted by the covenants and restrictions contained in the CIS and the Final Plat (Count I); seeking to quiet title (Count II); and, in the alternative, seeking a declaratory judgment that respondent Tyler Hockman's use of firearms within the subdivision violates the subdivision's covenants and restrictions (Count III).

The petitioner argued below, and on appeal, that as successor in interest to Mr. and Mrs. Stephens she is entitled to the benefit of the rule that "[a] purchaser under the deed of trust would take the property entirely free of any subsequent encumbrance thereon[.]" *Hite v. Donnally*, 85 W. Va. 640, 102 S.E.2d 478 (1920). Following briefing and oral argument,

---

[10] The petitioner stated that she "intend[ed] to create hiking/riding trails on the majority of the 20 acres"; to clear the brush from approximately 6 acres in order "to create an open grass field for Mountain View polo to ride and train horses on"; to leave a buffer zone of existing shrubs and trees along the border of the common area "to protect everyone's privacy if they wish"; and finally, subject to Planning Commission approval, "to hold polo practices on the cleared field during the 4 month polo field season of June-Sept."

[11] The respondents deny that they ever made such a threat.

[12] The respondents were the only named defendants, as all other property owners in the subdivision have entered into agreements whereby they waived any right, title and interest they might have in the subject property in return for the petitioner's grant of "a right of way in common with her over the access easement as shown on the aforesaid [Final Plat] for access to and from their lots subject to the other matters set forth in the Covenants concerning the obligation to maintain Falcon Ridge Drive."

the circuit court denied the petitioner's motion for declaratory judgment and granted

judgment in favor of the respondents, concluding that

> [e]ach of the purchasers of the subdivision lots sold pre-foreclosure, by their purchase of a lot created by the Final Plat, acquired as an appurtenance to their lot, the right to use Falcon Ridge Drive and the Common Area, all as shown on the Final Plat. Likewise, the Substitute Trustee, in selling at foreclosure sale the lots and the remaining acreage, including the Common Area, by reference to the Final Plat, conveyed each of those lots with an easement appurtenant in Falcon Ridge Drive and the Common Area as shown on the Final Plat.

Subsequently, the court denied the petitioner's motion to alter or amend, after which it

entered a supplemental order pursuant to West Virginia Rule of Civil Procedure 54(b),

certifying that "the litigants and overall justice is best served by allowing an immediate

appeal of the Court's December 3, 2019 Order," and further that "the matter involves an

issue deserving of review by the West Virginia Supreme Court of Appeals and that there

is no just reason for delay."[13]

## II. Standard of Review

This action comes before us on appeal from the circuit court's denial of

declaratory relief and its subsequent denial of petitioner's motion to alter or amend

judgment. *See* W. Va. R. Civ. P. 59(e). With respect to the court's denial of relief on the

merits, we have held that "[a] circuit court's entry of a declaratory judgment is reviewed

---

[13] The court noted that "[t]he remaining issues in the case involve alleged violations of covenants and restrictions relating to real estate separate from the real estate that is the subject of counts I and II of the [petitioner's] complaint."

9

*de novo.*" Syl. Pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995). "[H]owever, any determinations of fact made by the circuit court in reaching its ultimate resolution are reviewed pursuant to a clearly erroneous standard." *Id*. at 612, 466 S.E.2d at 463. Finally, "[t]he standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. Am. Travellers Life Ins. Co.,* 204 W.Va. 430, 513 S.E.2d 657 (1998).

## III. Discussion

In resolving the issues raised herein, we examine the application of long-established principles of property law to the particular facts and circumstances of this case, where the rights of one property owner, petitioner, are at odds with the claimed rights and/or reasonable expectations of other property owners in the same planned community, respondents.

In our analysis of the relevant facts and applicable law, all roads lead back to the Watson deed, which describes the parent tract purchased by Wolverine, and the credit line deed of trust executed on February 3, 2005, whereby Wolverine conveyed the parent tract to K. Stephen Morris, Trustee, for the benefit of Jefferson Security Bank, to secure

"(1) payment of the indebtedness[14] and (2) performance of each agreement and obligation of grantor under the credit agreement, the related documents, and this deed of trust." In this regard, this Court has noted that

> [a] 'deed of trust' is a deed that conveys title to real property in trust as security until the grantor repays the loan. In the case of default of a debt secured by a deed of trust, the property becomes liable to sale under the power of sale conferred upon the trustee.

Syl. Pt. 7, *Arnold v. Palmer*, 224 W. Va. 495, 686 S.E.2d 725 (2009). As detailed *supra*, the deed of trust described the property in metes and bounds, mirroring the description in the Watson deed. As had been the case with the Watson deed, the deed of trust specifically excepted three parcels contained within the parent tract of 15.04, 7.2865, and .44 acres, respectively,[15] and specifically included "a permanent non-exclusive right of way or easement for means of ingress and egress." The deed of trust did not contain any reference to the CIS, the Final Plat and its "Notes," or the Declaration, either at the time of its execution – at which point none of these documents had yet come into existence – or by written amendment thereto at any time thereafter. Significantly in this regard, the deed of trust contained the standard Amendments clause set forth *supra* in detail, which provided that the deed of trust and any related documents constituted the entire agreement of the

---

[14] The maximum amount of the indebtedness was not to exceed $1,387,500.00.

[15] At some point, these three tracts were all owned by Mr. and Mrs. Stephens, a fact which may explain their interest in purchasing the "additional acreage" at the trustee's sale but is otherwise immaterial to the resolution of this case.

parties and that no amendment or alteration to the deed of trust was valid unless "given in writing and signed by the parties seeking to be bound by said alteration."

The deed of trust outlined the role of the trustee, who in the event of a default on the part of Wolverine assumed "all of the rights and duties of [JSB]" and had the power "to sell all or any part of the Property together or separately, in one sale or by separate sales."[16] With respect to those rights, powers, and duties, we have held that "[t]he rights, powers, and duties of a trustee in a deed of trust executed to secure the payment of a debt are *limited and defined by the instrument under which he acts*[,]" Syl. Pt. 5, in part, *George v. Zinn*, 57 W. Va. 15, 49 S.E. 904 (1905) (emphasis added), and that the trustee's fiduciary duties are circumscribed by the provisions of West Virginia Code § 38-1-3 (2011).[17] The statute provides that

---

[16] *See* text *infra*.

[17] In *Lucas v. Fairbanks*, 217 W. Va. 479, 618 S.E.2d 488 (2005), the Court made it clear that although a trustee is not required to perform any act beyond those specified in the deed of trust and/or the statute, he or she has the power to do so under certain circumstances:

> Where there is, from any cause, an impediment to his making a fair and proper sale, (1) as where, from the fact of the deed of trust being one of long standing, or from any cause, the amount due and to be raised by a sale is uncertain; (2) where there are various deeds of trust or other incumbrances; (3) where the legal title is outstanding; (4) where there is a cloud upon the title,—*the trustee may,* of his own motion, apply to a court of equity to remove such impediment to a proper

12

[t]he trustee in any trust deed given as security shall, whenever required by any creditor secured or any surety indemnified by the deed, or the assignee or personal representative of any such creditor or surety, after the debt due to such creditor or for which such surety may be liable shall have become payable and default shall have been made in the payment thereof, or any part thereof, by the grantor or other person owing such debt, and if all other conditions precedent to sale by the trustee, as expressed in the trust deed, shall have happened, *sell the property conveyed by the deed*, or so much thereof as may be necessary, at public auction, having first given notice of such sale as prescribed in the following section.

*Id.* (emphasis added).

We turn now to the petitioner's specific arguments, which boil down to four contentions: that the circuit court erred in applying *Carden*,[18] wrongly concluding that it materially modified the hard-and-fast rule set forth in *Hite v. Donnally*, 85 W. Va. 640, 102 S.E. 478 (1920); that the court erred in finding that neither the petitioner nor her predecessors in interest, Mr. and Mrs. Stephens, were bona fide purchasers of the common area; that the court erred in applying the "common scheme" doctrine to the facts at bar; and that the court erred in applying the "unity rule" to the facts at bar. We address these issues in turn.

---

execution of the trust; and, if he should fail to do this, the party injured by his default has a right to make such application.

*Id.* at 486-87, 618 S.E.2d at 495-96 (citing Syl. Pt. 8, *Hartman v. Evans*, 33 W. Va. 669, 18 S.E. 810 (1893)).

[18] *See* 109 W. Va. 655, 155 S.E.2d 914.

First, we address the *Carden* issue. Pursuant to both the terms of the deed of trust and the applicable statute, the trustee in the case at bar had the power to sell only the property described in the deed of trust, and any purchaser was charged with knowledge "that what he buys at a trustee's sale is what the trustee has." *Hite,* 85 W. Va. at 644, 102 S.E. at 479. Concomitantly, and of critical significance to the instant case, this Court held in *Hite* that "[s]o far as the subsequent liens are concerned they in no wise affect the interest conveyed to the trustee. A purchaser under the deed of trust would take the property entirely free of any subsequent incumbrance thereon[.]" *Id.* at 643, 102 S.E. at 479.[19] We subsequently clarified and narrowed the *Hite* rule in *Carden*:

> A bona fide purchaser at a trustee's sale (regularly conducted) under a recorded deed of trust takes the property sold free from a recorded contract relating thereto, made by the grantor of the trust deed, subsequent to the deed but prior to the sale; neither the trustee nor the beneficiary being a party to the contract.

*Carden*, 109 W. Va. at 655, 155 S.E. at 914, Syllabus. In *Carden*, the plaintiffs, grantors of a deed of trust, entered into a contract with an adjoining lot owner by which the grantor agreed not to erect a structure more than fourteen feet in height on their property. This contract was recorded. Subsequently, after the grantors had defaulted on the loan secured by the deed of trust, the property was purchased by the defendant at a trustee's sale. The defendant began construction of a structure that would violate the terms of the aforementioned agreement, and plaintiffs filed suit to have the trustee's deed set aside. *Id.*

---

[19] This holding, often designated as "the *Hite* rule," has been on the books for one hundred years but was never elevated to a syllabus point.

at 656, 155 S.E. at 915. This Court denied relief, holding that an equitable remedy could not be applied to a regularly conducted foreclosure sale against an innocent purchaser without notice. To rule otherwise, the Court wrote, would "subordinate[] the trust deed executed by [grantors] to a subsequent agreement made by them to which neither [purchaser] nor [trustee] was a party." *Id*. (citing *Nagle v. Syer*, 143 S.E. 690 (Va. 1928)).

The petitioner contends that *Carden* is inapplicable to the instant case because its holding was dicta. In support of this argument the petitioner cites language in the case stating that "[i]t is not necessary to consider what effect, if any, notice of plaintiff's claims would have on the standing of [the defendant]," who "denies (without controversion) actual notice thereof and under our recording acts is not affected by constructive notice." *Id*. at 657, 155 S.E. at 915. We need not devote an extended analysis to this argument, as it based upon a flawed assumption: that because the factual issue of notice was uncontested, it was immaterial to the Court's resolution of the case. To the contrary, we agree with the circuit court that in *Carden*, the defendant's status as an innocent purchaser without notice was "central to the Court's decision[.]" Unlike the rule set forth in *Hite*, *see supra* note 20, the rule in *Carden* was encompassed in a syllabus point, demonstrating that it was a new point of law and/or was intended "to change established patterns of practice by the Court." Syl. Pt. 1, in part, *State v. McKinley*, 234 W. Va. 143, 764 S.E.2d 303, 306 (2014). As a result of the constitutional directive that this Court "prepare a syllabus of the points adjudicated in each case . . . which shall be prefixed to the published report of the case," W. Va. Const.,

15

art. VIII, §4, "the syllabus in every published opinion is an integral part of the decision itself." *McKinley*, 234 W. Va. at 149, 764 S.E.2d at 309.

In light of the above, we reject the petitioner's argument that *Carden* is inapplicable to this case because its holding was dicta. However, the question now to be determined is whether the circuit court erred in finding that petitioner and her predecessors in interest, Mr. and Mrs. Stephens, were not bona fide purchasers.

At the outset, we note that, as previously detailed, although the individuals who purchased lots from Wolverine prior to the foreclosure received deeds that referenced the existence of the Final Plat and specifically stated that the conveyances were subject to the "Notes," the purchasers at the trustee's sale in 2012 – Mr. and Mrs. Stephens and JSB – received deeds that contained no such references. Rather, their deeds described the property by reference to the metes and bounds set forth in the Watson deed and the deed of trust, which description made no mention of any covenants or restrictions contained in the CIS, the Final Plat and its "Notes," or the Declaration. In the absence of any evidence that Mr. and Mrs. Stephens and/or JSB were not bona fide purchasers, they took exactly what the trustee had to give: the common area, for Mr. and Mrs. Stephens, and Lots 2, 3, and 7, for JSB, all unencumbered. Thereafter, their respective successors in interest, petitioner and respondents, took the same. We also note that although the circuit court devoted the majority of its analysis to the question of whether the petitioner was a bona fide purchaser of the common area, which she acquired from Mr. and Mrs. Stephens in

16

2017,[20] this issue is wholly immaterial under the facts and circumstances of this case. Rather, the dispositive issue is whether Mr. and Mrs. Stephens, the petitioner's predecessors in interest, were bona fide purchasers of the common area, which they acquired at the trustee's sale in 2012. If they were, then pursuant to *Carden* they took the property free and clear of any covenants or restrictions appearing in the CIS, the Final Plat, or the Declaration, all of which post-dated the execution of the deed of trust. Four years later, when they sold the property to the petitioner, Mr. and Mrs. Stephens conveyed what they owned: the property free and clear of any covenants or restrictions appearing in the CIS, the Final Plat, or the Declaration. Conversely, if Mr. and Mrs. Stephens were not bona fide purchasers, as the circuit court concluded, then they may be charged with searches beyond their chain of title. *See*, *e.g.*, *Wolf v. Alpizar*, 219 W. Va. 525, 529-30, 637 S.E.2d 623, 627-28 (2006) (in order to be a bona fide purchaser one must be "without notice of

---

[20] The circuit court concluded that because the petitioner had actual notice of the existence of the CIS, the Final Plat and its "Notes," and the Declaration, she had a duty to "take care, and make due inquiries[.]" *Pocahontas Tanning Co. v. St. Lawrence Boom & Mfg. Co.*, 63 W. Va. 685, 695, 60 S.E. 890, 894 (1908) (citing *Burwell's Adm'rs v. Fauber*, 21 Grat. 446 (Va. 1871)). A purchaser with actual or constructive notice

> must look to the title papers under which he buys, and is charged with notice of all the facts appearing on their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information, and then say he is a bona fide purchaser without notice.

*Id*. The circuit court held that Mr. and Mrs. Stephens were not bona fide purchasers either, by virtue of a reference to the Final Plat contained in the trustee's notice of sale. *See* text *infra*.

any suspicious circumstances to put him on inquiry."); *Eagle Gas Co. v. Doran & Associates, Inc.*, 182 W. Va. 194, 197, 387 S.E.2d 99, 102 (1989) ("when a prospective buyer has reasonable grounds to believe that property may have been conveyed in an instrument not of record, he is obliged to use reasonable dililgence to determine whether such previous conveyance exists.") (citations omitted).

This Court's formulation of the bona fide purchaser rule was first set forth in *Pocahontas Tanning*:

> Whatever fairly puts a party on inquiry is regarded as sufficient notice where the means of knowledge are at hand; and a purchaser, whenever he has sufficient knowledge to put him on inquiry, or where he has been informed of circumstances which ought to have led to such inquiry, is deemed to have been sufficiently notified to deprive him of the character of an innocent purchaser.

63 W. Va. at 694, 60 S.E. at 893 (citing George William Wardelle, A Treatise on the American Law of Vendor and Purchaser of Real Property § 263 (2d ed. 1902)). The respondents contend, and the circuit court held, that Mr. and Mrs. Stephens were not bona fide purchasers because they were on notice of the existence of the Final Plat by virtue of the trustee's notice of sale, which was published on December 12, 19 & 27, 2012. The notice provided, inter alia, that "[a]t the foreclosure sale, Lots 2, 3, 7 and any remaining acreage in Falcon Ridge Farms as shown on the plat recorded in Plat Book 24, at page 1 will be sold individually and then as a group." We find that this single reference to the Final Plat is far too slender a reed on which to base a conclusion that Mr. and Mrs. Stephens

18

were not bona fide purchasers. First, it will be recalled that the original purchasers, those individuals who bought their lots from Wolverine prior to the foreclosure, received deeds that specifically referred not only to the Final Plat but specified that the properties were subject to the "Notes" – a reference conspicuously absent from the trustee's notice. Second, if Mr. and Mrs. Stephens had drilled down into the history of the subdivision, they would have learned that neither a homeowners' association nor a common interest ownership agreement had ever been established; thus, at the time of the trustee's sale the additional acreage was *in fact* free and clear of any covenants or encumbrances which might have restricted Mr. and Mrs. Stephens' use of the property. Finally, and controlling, the trustee proffered, and Mr. and Mrs. Stephens accepted, a deed that conveyed the "additional acreage" free and clear of any liens and encumbrances set forth in the CIS, the Final Plat and its "Notes," or the Declarations.

As an additional basis for its conclusion that Mr. and Mrs. Stephens were not bona fide purchasers of the subject property, the circuit court found that "the language of a deed of trust can be modified by the subdivision of the land where the beneficiary of the deed of trust recognizes and approves of such subdivision or any plat of the same." Citing *Walker v. Summers*, 9 W. Va. 533 (1876), the court held that in this case the language of the deed of trust was effectively modified because "JSB recognized and consented to the Final Plat as shown by [its] release of the various lots created by the Final Plat." We disagree.

19

First, we first return to the deed of trust, which expressly provided that "[n]o alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment." In this regard, the deed of trust was never amended to include any mention of the CIS, the Final Plat and its "Notes," and/or the Declaration, either when those documents came into existence in 2005, 2006 and 2009, respectively, or at any time thereafter. As noted *supra*, the respondents claim that regardless of the lack of any written amendment to the deed of trust, the provisions of the CIS, the Final Plat and its "Notes," and/or the Declaration were sub silentio incorporated into the deed of trust by virtue of JSB's release therefrom of Lots 1, 4, 5, 6 and 8. The respondents contend, and the circuit court agreed, that this action by JSB evidenced JSB's "consent to the dedication of the common area such that each lot owner who purchased a lot prior to foreclosure acquired an easement in the subject property." The flaw in this argument is readily apparent: this case is not about the rights of the pre-foreclosure owners, whose rights, if any, have never been asserted and in fact have been affirmatively waived. *See supra* note 12. Rather, the issue before the Court is the rights, if any, of the respondents, who purchased their property six months after the trustee's sale. For this reason, the respondents' reliance on *Walker* is misplaced. In *Walker*, the grantor of the deed of trust sued to enjoin the trustee's sale of the property "in lots and by the acre" rather than in accordance with the subdivision plat. In contrast, in the instant case, no one having a pre-foreclosure interest in Falcon Ridge – the grantor, Wolverine; the owners of Lots 1, 4, 5, 6, and 8; or the secured party under the deed of trust, JSB – filed suit or raised any objection to the trustee's sale of the property by

20

reference solely to the metes and bounds, exceptions, covenants, and restrictions expressly set forth in the deed of trust.[21]

In a proper case *Walker* provides a remedy for a grantor who contends that is not necessary for the trustee to sell the entirety of the property in order to satisfy the debt secured by the deed of trust – a remedy which Wolverine never exercised, whether or not grounds may have existed therefor. Despite the respondents' attempts to pound a square peg into a round hole, *Walker* is simply inapposite to the case at bar; nothing in *Walker* can be read to provide a remedy by which a post-foreclosure purchaser can step into the shoes of the grantor and seek to reform a deed of trust after the trustee's sale has been concluded. To the extent that Wolverine may have had an interest in preserving the integrity of its initial vision for the property, or JSB may have believed that the provisions of the CIS, the Final Plat and its "Notes," and/or the Declaration, added some value to the property securing its loan,[22] neither acted to protect their respective interests – interests that cannot

---

[21] In this regard, it will be recalled that the deed of trust specifically gave the trustee the power to "to sell all or any part of the Property together or separately, in one sale or by separate sales."

[22] We recognized in *Indus. Bank of Richmond v. Holland Furnace Co*., 109 W. Va. 176, 153 S.E. 309 (1930), that

> It is settled law that the purchaser at a trustee's sale of realty acquires all the title of the grantor at the time of making the trust deed together with any after–acquired right secured by him which has inured to the benefit of the secured creditor. 3

now be the basis for court action by individuals who purchased their property well after the trustee's sale took place.

In sum, under the facts and circumstances of this case, and in the absence of any supporting case law, it cannot reasonably be concluded that JSB's knowledge of the CIS, the Final Plat and its "Notes," and/or the Declaration, was sufficient to incorporate the terms of those documents into the deed of trust. Had JSB felt that incorporation of those terms was necessary to protect its interests, it could have objected to the trustee's sale and/or sought to have the terms explicitly included in the trustee's deeds for Lots 2, 3, and 7. And although we will not foreclose the possibility of a different result in a case with different facts, we note that any doctrine of sub silentio incorporation of an encumbrance would certainly thwart the Legislature's purpose in enacting West Virginia Code § 38-1-3, which is "to provide a more time efficient and economical method of foreclosure" than a judicial foreclosure. *Lucas*, 217 W. Va. at 486, 618 S.E.2d at 495. It can hardly be denied that in requiring the trustee and prospective purchasers to delve into matters neither directly nor indirectly ascertainable from the language of the deed of trust, we would be construing

---

Jones on Mortgages (8th Ed.) § 2122, pp. 623–625; 41 C. J. 996.

109 W. Va. at 179, 153 S.E.2d at 310.

22

the statute "in a manner that complicates the trustee foreclosure process, as such a construction would be contrary to the legislative intent of the statute." *Id*.

As yet another basis for its decision, the circuit court cited the "common scheme doctrine," which provides that

> [w]here the owner of land divides it into lots in pursuance of a general plan for the development of an exclusively residential area and conveys the several lots to different grantees by deeds containing identical or substantially similar covenants restricting the use of the lots to residential purposes, an action in the nature of a suit in equity may be maintained by an owner of one such lot against the owner or owners of any other lot to compel compliance with the restriction.

Syl. Pt. 1, *Jubb v. Letterle*, 185 W. Va. 239, 406 S.E.2d 465 (1991) (citing Syl. Pt. 1, *Wallace v. St. Clair,* 147 W.Va. 377, 127 S.E.2d 742 (1962)). We conclude that although *Jubb* established a sound principle of law, its application to the situation at bar was clear error. There was no foreclosure sale in *Jubb*. Rather, that case presented a situation where all owners of property within a subdivision had purchased their respective lots from the developer/grantors,[23] who owned the parent tract. The grantors originally planned to utilize the whole of the property for a planned residential community, and the

---

[23] *See generally Armstrong v. Stribling*, 192 W. Va. 280, 452 S.E.2d 83 (1994); *Teays Farms Owners Ass'n, Inc. v. Cottrill*, 188 W. Va. 555, 425 S.E.2d 231 (1992); *Wallace,* 147 W. Va. 377, 127 S.E.2d 742.

plaintiffs' deeds contained certain restrictive covenants intended to achieve that end. Thereafter, when the grantors decided to pare down the size and scope of the subdivision, they intentionally omitted any mention of the restrictive covenants in subsequent purchasers' deeds. *Id.* at 242, 406 S.E.2d at 468. The plaintiffs sued the grantors, contending that the restrictive covenants applied to all lots in the subdivision, whether or not those covenants were contained in the later purchasers' respective deeds, as a consequence of the grantors' common scheme for the subdivision upon which the plaintiffs had relied when purchasing their lots. On these facts, we held that "the [plaintiff] grantees had acquired, by implication, an equitable right to enforce the restrictions against property retained by the grantor or even property subsequently sold without the restrictions where the purchaser had actual or constructive notice of the restrictions." *Id.* at 243, 406 S.E.2d at 469 (citing *Minner v. City of Lynchburg*, 129 S.E.2d 673 (Va. 1963)).

First, in contrast to the facts in *Jubb*, in the instant case there were three different grantors and an intervening foreclosure: the owners of Lots 1, 4, 5, 6, and 8 purchased their property from Wolverine, the developer/grantor, prior to foreclosure; the petitioner's predecessors in interest, Mr. and Mrs. Stephens, purchased the "remaining acreage" from the trustee at the foreclosure sale; and the owners of Lots 2, 3, and 7 – the latter being respondents – purchased their property from JSB, which in turn had purchased it from the trustee at the foreclosure sale. Second, the language in the respective deeds did not "contain[] identical or substantially similar covenants restricting the use of the lots[.]"

24

As set forth *supra*, the property sold at the trustee's sale, Lots 2, 3, and 7, and the remaining acreage, was conveyed by deeds free and clear of any encumbrances. Third, the plaintiffs in *Jubb* sued to enforce their preexisting rights, whereas here the defendant/respondents, Mr. and Mrs. Hockman, seek to enforce rights in the subject property that had been extinguished prior to their purchase of Lot 7. Even if this Court were to expand the common interest doctrine to include parties who did not all derive their rights from the same grantor, the only individuals who could invoke the doctrine would be the owners of Lots 1, 4, 5, 6, and 8, whose interests in the remaining acreage, if any, predated the trustee's sale. As noted earlier, these individuals have all waived any right, title or interest in the subject property.

Finally, the circuit court also applied the "unity rule," another equitable doctrine which provides that

> [w]hen lands are laid off into lots, streets, and alleys, and a map plat thereof is made, all lots sold and conveyed by reference thereto, without reservation, carry with them, as appurtenant thereto, the right to the use of the easement in such streets and alleys necessary to the enjoyment and value of such lots.

Syl. Pt. 2, *Cook v. Totten*, 49 W. Va. 177, 38 S.E. 491 (1901). As was the case with the "common scheme doctrine," the "unity doctrine" stated in *Cook* is wholly divorced from the facts of this case. In *Cook*, the heirs of the original property owner had partitioned the property into seven lots, and then sold those lots with specific reference in the deed to the alley that ran between the lots. When the City of Charleston took the position that the alley was a public thruway and sought to pave it, the owners filed suit for injunctive relief. Their

25

suit was successful because this Court found that on the face of the deeds, the alley was dedicated to the private use of the owners of the partitioned lots. Here, in contrast, the face of respondents' deed to Lot 7 contains no such language with respect to use of the subject property, which had been sold at the trustee's sale months earlier. In short, unlike their counterparts in *Jubb* and *Cook*, the respondents here had no pre-existing interest in any covenants or restrictions affecting the "common area" of Falcon Ridge at the time of the trustee's sale of that property to Mr. and Mrs. Stephens. Therefore, the respondents cannot invoke equitable remedies for the purpose of reinstating rights they never had.

## IV. Conclusion

For the foregoing reasons, the circuit court's order of December 3, 2019, is reversed. This case shall be remanded for the court to enter an order granting declaratory judgment to the petitioner and dismissing the respondents' counterclaim.[24]

Reversed and remanded with directions

---

[24] In light of our decision today finding that the petitioner is entitled to the declaratory relief she sought, Count II of the complaint, seeking to quiet title to the subject property, is moot. Proceedings on Count Three of the complaint are unaffected by this appeal; *see supra* note 13.

26